UNITED STATES of America, Plaintiff,

v.

Mario BIAGGI, Stanley Simon, Peter Neglia, John Mariotta, Bernard Ehrlich, Richard Biaggi, and Ronald Betso, Defendants.

No. 87 Cr. 265 (CBM).

United States District Court,
S.D. New York,
Manhattan Division.

Feb. 29, 1988.

Rudolph W. Giuliani, U.S. Atty., New York City, by Frederick M. Lawrence, Asst. U.S. Atty., for U.S.

LaRossa, Mitchell & Ross, New York City by James M. LaRossa, for defendant Mario Biaggi.

Kramer, Levin, Nessen, Kamin & Frankel, New York City by Maurice N. Nessen, David Seide, for defendant Stanley Simon.

Kevin P. McGovern, Brooklyn, N.Y., for defendant Peter Neglia.

Skadden, Arps, Slate, Meagher & Flom, New York City by Jeffrey Glekel, David H. Hennessy, for defendant John Mariotta.

Kostelanetz, Ritholz, Tigue & Fink, New York City by Peter J. Driscoll, for defendant Bernard Ehrlich.

Dominick F. Amorosa, New York City, for defendant Richard Biaggi.

Buchwald & Kaufman, New York City by Alan R. Kaufman, for defendant Ronald Betso.

**OPINION**

MOTLEY, District Judge.

On September 4, 1987, defendant John Mariotta, an Hispanic, moved this court for an order granting him access to the records used for the selection of grand and petit juries in the Southern District of New York. In support of this motion, Mariotta submitted an affidavit from a professional demographer whose analysis of voter registration data showed that the percentage of

the population registered to vote in primarily black and Hispanic voting districts is smaller than that in districts composed primarily of whites. The expert suggested that the Southern District's reliance upon voter registration lists as the exclusive source of prospective jurors would result in underrepresentation of blacks and Hispanics in the jury pool. Mariotta argued that a review of the requested records would confirm this suspicion and thereby prove that he had been indicted in violation of the United States Constitution and the Jury Selection and Service Act of 1968 (Jury Act), 28 U.S.C. § 1861 *et seq.* (1982). The Government agreed that Mariotta's request to inspect the records should be permitted. On November 9, 1987, this court granted Mariotta's discovery motion.

Having analysed the data contained in the jury selection records, Mariotta now moves the court to dismiss the indictment in this case. He argues that the statistics show that the grand jury that indicted him was in fact chosen pursuant to a system that violates his rights pursuant to the Jury Act and the fifth, sixth, and fourteenth amendments. The other defendants in the case join his motion.

The Government opposes this motion. The Government's experts criticize Mariotta's statistical analysis of the data culled from the records of juror selection. They suggest that the analysis cannot be relied upon to show that either blacks or Hispanics are significantly underrepresented on jury venires in the Southern District of New York. The Government also contends that even if the statistics Mariotta has compiled are accepted as valid as a matter of fact, they are inadequate as a matter of law to prove any of his claims.

The court conducted an evidentiary hearing on the motion on January 28 and 29, 1988.[1] At the close of defendant's case, the Government moved to dismiss the mo-

tion for failure to establish a *prima facie* claim. The court reserved judgment on this motion and directed the Government to present its evidence in rebuttal. Having carefully reviewed both the facts and the law pertaining to the disputed issues, the court now grants the Government's motion with respect to all claims.[2]

## I. THE STATISTICAL EVIDENCE

Mariotta's objection to the Southern District's Jury Plan is narrowly confined to a challenge to the court's reliance exclusively on voter registration lists as the source of prospective jurors. Ideally, the court would decide his motion first by examining data that showed the actual percentage of the relevant groups who have registered to vote over a period of time in the area served by the Manhattan courthouse and then by determining whether any disparities among those percentages were legally significant. Such statistics are apparently unavailable, however, because county election boards do not require persons registering to vote to identify themselves by race or ethnicity. *See* Tr. 72, 103. Consequently, the court must rely upon the more indirect methods used by defendant to discern the racial and ethnic composition of the jury pool in question. Familiarity with the following aspects of the Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York (Jury Plan) is essential to understanding these methods.

Under the current Jury Plan, the Jury Clerk first obtains voter registration lists of the eight counties constituting the Southern District. The names on these lists are then immediately distributed—according to a formula of no present importance—into two Master Jury Wheels, one for the Manhattan courthouse and one for

---

1. References to testimony from this hearing are keyed to the transcript and cited as "Tr. ___".

2. The court tentatively denied a similar motion on December 22, 1987. At that time, however, the Government had not yet responded to Mariotta's motion and the court needed additional

time to consider the complex factual and legal questions presented. In light of the extensive briefing since completed by both parties and the evidence introduced at the January hearing, the court now determines that the motion should be granted.

the White Plains courthouse. The Master Jury Wheels are "emptied" and "refilled" after every presidential election. The instant motion is based on alleged underrepresentation of blacks and Hispanics on the Master Jury Wheel of the Manhattan courthouse only. The remaining description of relevant jury selection procedures therefore refers to those followed in Manhattan.

The Jury Clerk initially places in the Master Jury Wheel the number of names sufficient to supply the court's estimated juror requirements for four years. The Clerk then estimates the number of persons to whom Juror Qualification Questionnaires must be sent to obtain an adequate supply of qualified jurors for service over the next six months. The number of names in the Master Jury Wheel is divided by the number of persons to whom questionnaires will be sent to obtain a "quotient." For example, if there were 100,000 names in the Master Jury Wheel and the Clerk determined that 1,000 persons should receive questionnaires, then the quotient would be 100. The Clerk would then send a questionnaire to every 100th person on the Master Jury Wheel, starting with a randomly selected "starting number." The group of people selected in this fashion is denominated a "reel." This process is repeated approximately every six months as the Jury Clerk deems necessary, selecting each subsequent reel from the progressively diminishing list of names on the Master Jury Wheel.

The questionnaire sent to each person on a reel requests information regarding, among other things, the prospective juror's race and whether he or she is Hispanic. The prospective juror is directed to return the questionnaire to the District Court in an envelope provided by the court. The

Jury Clerk keeps the returned questionnaires for further reference.

## A. Mariotta's Analysis

George Leyland, the expert statistician and demographer who testified for the defense, employed three random sampling techniques to estimate the relevant racial and ethnic composition of the 1984 Manhattan Master Jury Wheel. He first analyzed the third and fourth reels of the 1984 Master Jury Wheel by having Mariotta's counsel select every fifth juror questionnaire from the batches of returned questionnaires maintained by the Jury Clerk. Mariotta's counsel recorded the relevant racial and ethnic characteristics of the 5,784 selected prospective jurors who had provided the necessary information. Leyland then compared the percentage of prospective jurors who had identified themselves as black or Hispanic on the questionnaires with the percentage of citizens at least eighteen years of age who so identified themselves in the 1980 Census.[3] He determined that the likelihood that the disparities he found between these percentages could occur by chance is less than one in one trillion. *See* Defendant's Exh. 2(E), (F).

To confirm these findings, Leyland analysed a second sample from the third and fourth reels of the 1984 Master Jury Wheel. Beginning with the second person on a computer print-out of combined reels three and four, Mariotta's counsel recorded on juror data sheets the name and other identifying characteristics of every 100th person. This process generated a list of 447 prospective jurors. Counsel then endeavored to locate the juror questionnaires that had been returned by this group. When a questionnaire could be located and it provided the necessary information, counsel recorded the person's race and whether the person was Hispanic on the

3. For the purpose of Mariotta's analysis, the term "Hispanic" denoted all persons who indicated they were Hispanic, irrespective of race. The term "black" referred only to non-Hispanic blacks. *See* Tr. 212–13. The Census Bureau, on the other hand, includes Hispanic blacks in the "black" category. *See* Tr. 215. In virtue of the different definitions of these terms, Mariotta's figures estimating black representation on the Master Jury Wheel are not strictly commensurable with the Census figures; defendant's figures understate the representation of blacks to the extent that Hispanic blacks are eliminated from his computation. In addition, the census figures have not been adjusted to account for the one-year residence requirement for voter registration, so they will to some unspecifiable degree overstate the population of eligible jurors.

appropriate juror data sheet. To calculate the percentages of blacks and Hispanics on the Master Jury Wheel, Leyland divided the number of persons who had identified themselves as black or Hispanic by the number of questionnaires that had been returned, even if those returned questionnaires could not be found or provided no answer to the questions regarding race and ethnicity. Leyland said that he adopted this method of analysis because he did not want to make any assumptions about whether the persons associated with the lost or incomplete questionnaires were black or Hispanic, *see* Tr. 58, and because the method is also employed on the JS–12 form, *see* Tr. 34–35, which is used by the Jury Clerk to report racial population data pursuant to 28 U.S.C. § 1863(a). The analysis revealed disparities between the percentages of blacks and Hispanics on the 1984 Master Jury Wheel and those in the eligible population that could occur by chance less than once in one hundred times. *See* Defendant's Exh. 2(E), (F).

In addition, Leyland applied the print-out method to the first reel of the 1984 Master Jury Wheel, selecting every fifth name for analysis. This method yielded a total sample of 1,079 prospective jurors. Of this group, only 771 returned juror questionnaires. This sample disclosed disparities that could occur by chance less than once in one billion times for Hispanics and less than once in one hundred thousand times for blacks. *See* Defendant's Exh. 2(E), (F).

Leyland also applied the print-out method to the 1980 Master Jury Wheel for the Southern District of New York.[4] The total sample derived by this method included 4,519 prospective jurors, 3,000 of whom returned questionnaires. Analysis of the information reported on the questionnaires that could be found revealed disparities that could result on a random basis less than once in one trillion times. *See* Defendant's Exh. 2(E), (F).

The various population figures produced by Leyland's analyses of the four samples appear in the charts below.

| | Percent Black | Percentage of Jury Wheel | Actual Disparity |
|---|---|---|---|
| 1980 | 17.9% | 10.9% | 7.0% |
| 1984 | 19.9% | | |
| Reel 1 | " | 14.8% | 5.1% |
| Reels 3/4 (B)[5] | " | 15.1% | 4.8% |
| Reels 3/4 (P)[6] | " | 14.2% | 5.7% |

| | Percent Hispanic | Percentage of Jury Wheel | Actual Disparity |
|---|---|---|---|
| 1980 | 13.7% | 5.7% | 8.0% |
| 1984 | 15.7% | | |
| Reel 1 | " | 7.5% | 8.2% |
| Reels 3/4 (B) | " | 10.5% | 5.2% |
| Reels 3/4 (P) | " | 10.2% | 5.5% |

Assuming that 50–60 jurors are summoned for the average jury venire, the disparity between the census figures and the Master Jury Wheel figures could be wholly eliminated by adding 2–4 blacks and 3–4 Hispanics.

Leyland also testified that the 1984 Master Jury Wheel figures ought to be compared to 1984 population figures rather than those from the 1980 census. *See* Tr. 40. He stated that the 1980 census figures understate the black and Hispanic population in 1984 for two reasons: 1) the Census Bureau undercounted blacks and Hispanics in 1980 and 2) the non-white population of the Southern District has grown disproportionately since 1980. *See* Tr. 22–24. To adjust for the undercount, Leyland used Post–Enumeration Program (PEP) analyses used by the Census Bureau in other contexts. *See* Tr. 22–23. He updated the population figures by referring to a study prepared for the Census Bureau by the National Cancer Institute. *See* Tr. 23–24. The tables below show the results of Leyland's analysis after adjusting for these two factors.

---

4. The White Plains courthouse was not in use in 1980, so the figures for the 1980 Master Jury Wheel refer to the population of the entire Southern District.

5. "(B)" refers to the batch method.

6. "(P)" refers to the printout method.

| | Percent Black | Percentage of Jury Wheel | Actual Disparity |
|---|---|---|---|
| 1980 | 19.6% | 10.9% | 8.7% |
| 1984 | 23.5% | | |
| Reel 1 | " | 14.8% | 8.7% |
| Reels 3/4 (B) | " | 15.1% | 8.4% |
| Reels 3/4 (P) | " | 14.2% | 9.3% |

| | Percent Hispanic | Percentage of Jury Wheel | Actual Disparity |
|---|---|---|---|
| 1980 | 14.7% | 5.7% | 9.0% |
| 1984 | 18.3% | | |
| Reel 1 | " | 7.5% | 10.8% |
| Reels 3/4 (B) | " | 10.5% | 7.8% |
| Reels 3/4 (P) | " | 10.2% | 8.1% |

If the average jury venire comprises 50–60 jurors, eradicating the discrepancies between Leyland's revised eligible population figures and the Master Jury Wheel figures would require the addition of 4–5 blacks and 4–6 Hispanics.

## B. Findings of Fact

The court finds that defendant's revised figures overstate the disparities between the percentage of blacks and Hispanics in the population of eligible voters and the percentages of those groups on the 1984 Master Jury Wheel. The overestimation results from two basic errors in Leyland's analysis: 1) unreliable adjustments of the 1980 census figures and 2) inappropriate treatment of questionnaires that provided no answer to questions regarding race and ethnicity or that could not be located. Even after correcting for these mistakes, however, the data reveal some underrepresentation of blacks and Hispanics.

### 1. Adjustments of the 1980 Census Figures

The court finds that Leyland improperly relied upon the PEP analyses to correct for the census undercount. The Census Bureau did not intend that these sample estimates of undercounting, which have a large sampling error, be used to adjust for an undercount in the present context. See Tr. 182. Moreover, the numbers Leyland used for his adjustment refer to the entire population not just the population of eligible voters. See Tr. 182–83.

Leyland also adjusted for population growth in an improper manner. The Census Bureau recognized that the figures in the National Cancer Institute study were not reliable for the purpose of estimating changes in racial composition. See Tr. 184. The Bureau explicitly recommended that "only the data for all races be used in general analytical applications." Id. Because the Census Bureau research in this area is experimental, Leyland's estimates of population growth are too speculative to support his adjustment. The court concludes that the analysis based on revised population figures must be rejected.

### 2. Incomplete and Lost Questionnaires

Even the analysis using 1980 census figures relies upon an improper treatment of incompletely answered and lost questionnaires. In administering the print-out method, Leyland devised a fraction that was supposed to portray the proportion of black or Hispanic prospective jurors on the Master Jury Wheel. Leyland defined each fraction so that the number of persons whose questionnaires either contained no answer to questions of race and ethnicity or were lost was included in the denominator but not the numerator. See Tr. 33–35; 57–59. His defense of this procedure is unpersuasive for two reasons.

First, Leyland claims that he adopted this method in order to avoid making unsupported assumptions about the race or ethnicity of prospective jurors. By including the number of incomplete and lost questionnaires in the denominator while excluding them from the numerator, however, Leyland implicitly assumed that none of those questionnaires had been returned by either blacks or Hispanics. Thus, Leyland's procedure did not enable him to avoid making assumptions about the racial or ethnic characteristics of the prospective jurors whose questionnaires were incomplete or invalid. It committed him instead to an assumption that would distort his analysis in favor of Mariotta's claim. By enlarging the denominator and reducing the numerator, he increased the apparent

underrepresentation of blacks and Hispanics.

Leyland also attempts to defend his methodology by pointing out that it is followed by the District Court in reporting racial representation on its JS–12 forms. It is unclear, however, whether the District Court's treatment of incomplete and lost questionnaires on the JS–12 form should be deemed authoritative in the present context. Although the exceedingly conservative statistics generated by this methodology may serve the purpose of the JS–12 form, the court requires more precise figures to decide this motion. Moreover, the Census Bureau has a quite different approach to the problem of incomplete questionnaires. When it receives a questionnaire that does not indicate the person's race or ethnicity, it will impute a value for that person. *See* Tr. 168–69. Leyland indicated in other contexts that he sought to replicate Census Bureau methodology, *see* Tr. 9, 23, and his decision to use a different methodology in this particular instance just happens to result again in exaggerated estimates of black and Hispanic underrepresentation in the jury pool.[7]

The ideal treatment of the incomplete and lost questionnaires in the present case would probably have been to use the Census Bureau's procedure to impute racial and ethnic values where they were lacking. This procedure is apparently quite complicated, *see* Tr. 171, however, and it is unclear whether defendant could have been expected to complete it in the time allotted. Moreover, the court recognizes that it is preferable to avoid combining statistical methodologies. *See* Tr. 54–56. Leyland should therefore have adopted a methodology consistent with his treatment of unreturned questionnaires. The incomplete and lost questionnaires should have been excluded from the analysis.

The data revealed after correcting these errors are presented in the following tables.

|  | Percent Black | Percentage of Jury Wheel | Actual Disparity |
|---|---|---|---|
| 1980 | 19.6% | 12.0% | 7.6% |
| 1984 | 19.9% | | |
| Reel 1 | " | 15.9% | 4.0% |
| Reels 3/4 (B) | " | 16.3% | 3.6% |
| Reels 3/4 (P) | " | 18.3% | 1.6% |

|  | Percent Hispanic | Percentage of Jury Wheel | Actual Disparity |
|---|---|---|---|
| 1980 | 14.7% | 6.3% | 8.4% |
| 1984 | 15.7% | | |
| Reel 1 | " | 8.1% | 7.6% |
| Reels 3/4 (B) | " | 11.3% | 4.4% |
| Reels 3/4 (P) | " | 13.1% | 2.6% |

To eliminate the disparities between the eligible population and the percentages of each group on the 1984 Master Jury Wheel, 1–2 blacks and 1–4 Hispanics would have to be added to an average venire of 50–60 jurors.

The court finds that the above figures represent the best available estimates of the relevant population figures. In so finding, the court rejects several additional attempts by the Government further to reduce the estimates. First, the court agrees with defendant that the unreturned questionnaires should have been excluded from the analysis. The use of a different sampling technique, such as a Spanish surname analysis, to estimate the proportion of Hispanics who did not return questionnaires would impermissibly mix statistical methodologies. Second, the court finds that ability to speak English is irrelevant for present purposes. The Government has confused the concepts of "eligibility" and "qualification" in arguing that persons who

7. The Government's expert testified that persons who leave questionnaires blank tend for various reasons to be disproportionately black and/or Hispanic. *See* Tr. 170. Therefore, the percentage of blacks and Hispanics in the Census Bureau estimates of the eligible population is likely to grow when a racial or ethnic characteristic is imputed to persons who do not answer questions on those subjects. By rejecting Census Bureau procedure in this case, Leyland avoids increasing his estimates of the percentages of blacks and Hispanics in the jury pool. The comparison of figures derived by Leyland's method with figures derived by the Census Bureau's method increases the disparity between the proportions of blacks and Hispanics in the jury pool and those in the eligible population.

do not speak English should be excluded from the analysis. The focus here is on *eligible* jurors whose names are taken from voter registration lists; one need not speak English to register to vote. The court now turns to the question of the legal significance of the disparities shown.

## II. THE LEGAL CLAIMS

The court notes at the outset that Mariotta must prove that the allegedly excluded minority groups are legally distinct for the purposes of both his constitutional and statutory claims. The Government does not contest his right to challenge discrimination against blacks but it does dispute whether Hispanics are a legally cognizable group. By sending prospective jurors a questionnaire asking them to specify whether they are Hispanic, the Southern District implicitly recognizes that Hispanics are a distinct group. *See* Defendant's Exh. 3. This court will therefore assume for the purposes of the present motion that Hispanics are legally distinct.

### A. *The Fifth Amendment*

■ The fifth amendment, which applies to the federal government, does not expressly guarantee equal protection of the laws. The fourteenth amendment does contain an equal protection clause, but it applies only to the states. Strictly speaking, then, when allegations of discrimination are raised against the federal government, the court must ask not whether the complainant has been deprived of equal protection of the laws but whether he or she has proven discrimination that is "so unjustifiable as to be violative of due process." *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); *see Schlesinger v. Ballard,* 419 U.S. 498,

500 n. 3, 95 S.Ct. 572, 574 n. 3, 42 L.Ed.2d 610 (1975).

In the context of discrimination claims, however, the distinction between these two questions and the difference in scope between the concepts of equal protection and due process, *see Bolling v. Sharpe,* 347 U.S. at 499, 74 S.Ct. at 694, are evidently of no substantive significance. The substantive standard to be applied in resolving discrimination claims against the federal government appears to be identical to that used in deciding equal protection claims against the states. *Compare Bolling v. Sharpe,* 347 U.S. at 499–500, 74 S.Ct. at 694–95 (deciding a race discrimination claim against the federal government) *and Brown v. Board of Education,* 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954) (deciding identical race discrimination claims against four states). For this reason, the court concludes that a discrimination claim pursuant to the fifth amendment should be governed by *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), which articulates the test for determining when a criminal defendant has shown that grand jury selection procedures violate the equal protection clause. *See Crawford v. Cushman,* 531 F.2d 1114, 1121 n. 7 (2d Cir.1976) ("The equal protection clause is applicable to the federal government under the due process clause of the Fifth Amendment."); *but see United States v. LaChance,* 788 F.2d 856, 864 (2d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986) (applying the test articulated in the sixth amendment case of *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed. 2d 579 (1979), to claims pursuant to the fifth and sixth amendments and the Jury Act [8]). Mariotta's claim pursuant to the fourteenth amendment must be dismissed

---

**8.** This court points out that the Second Circuit did not distinguish between the fifth and sixth amendment claims in *LaChance* because the appellant there "spelled out no separate argument on his fifth amendment challenge." *LaChance,* 788 F.2d at 864. In the present case, the Government at least has explicitly distinguished between Mariotta's equal protection claim pursuant to the fifth amendment and his sixth amendment claim. Mariotta has also sep-

arately argued his equal protection and sixth amendment claims (although apparently without realizing that the equal protection claim derives from the fifth, not the fourteenth, amendment). Because the circumstances that led the Second Circuit to adopt its approach in *LaChance* do not obtain here, Mariotta's fifth and sixth amendment claims will be analysed separately.

because he is not challenging State procedures, but the court will consider the substance of his allegations under the rubric of the fifth amendment.

### 1. Standing

■ Before discussing the substantive test to be applied in ruling on Mariotta's fifth amendment claim, the court must consider the preliminary question of standing. Some lower courts have concluded that discrimination claims against the federal government pursuant to the due process clause may be asserted only by persons who are members of the group that has allegedly been excluded by the contested jury selection procedures. *See United States v. Musto*, 540 F.Supp. 346, 351–53 (D.N.J.1982), *aff'd on other grounds sub nom. United States v. Aimone*, 715 F.2d 822 (3d Cir.1983), *cert. denied*, 468 U.S. 1217, 104 S.Ct. 3585, 82 L.Ed.2d 883 (1984); *United States v. Layton*, 519 F.Supp. 946, 957 (N.D.Cal.1981). On the other hand, the only circuit court directly to address this question has expressly rejected this narrow standing requirement. *See United States v. Cross*, 708 F.2d 631, 634 (11th Cir.1983), *vacated on other grounds*, 468 U.S. 1212, 104 S.Ct. 3580, 82 L.Ed.2d 879 (1984); *United States v. Holman*, 680 F.2d 1340, 1355–56 (11th Cir.1982); *United States v. Perez–Hernandez*, 672 F.2d 1380, 1386 (11th Cir.1982).

The present disagreement among the courts regarding standing to assert grand jury discrimination claims against the federal government arises out of two apparently contradictory rules announced by the Supreme Court in *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), and *Castaneda*.[9] In *Peters*, the Court unambiguously declared that "whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law." 407 U.S. at 504, 92 S.Ct. at 2169. In *Castaneda*, the Court stated that "in order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of *his* race or of the identifiable group *to which he belongs.*" 430 U.S. at 494, 97 S.Ct. at 1280 (emphasis added). The interplay of due process and equal protection principles in discrimination cases against the federal government brings these statements, which otherwise might simply be held applicable to different constitutional clauses, into apparent conflict. *Peters* permits a criminal defendant to raise a due process challenge to exclusionary jury selection irrespective of his or her racial identity. A defendant who raises discrimination claims against the federal government, and who is therefore protected by the fifth amendment's due process guarantee, would therefore appear to be governed by this broad rule on standing. *See United States v. Perez–Hernandez*, 672 F.2d at 1386. On the other hand, if equal protection standards are to be borrowed from fourteenth amendment cases when race discrimination claims are raised against the United States, then the defendants in this case would seemingly be subject to *Castaneda*'s narrower standing requirement. *See United States v. Musto*, 540 F.Supp. 346, 352 (D.N. J.1982). If *Peters* controls in the present case, all of the defendants have standing to allege the fifth amendment violation; if *Castaneda* controls, Mariotta alone may bring this claim,[10] which is further nar-

---

9. Both *Peters v. Kiff* and *Castaneda v. Partida* involved challenges to *state* procedures. The petitioner in *Peters v. Kiff* raised claims pursuant to the Due Process and Equal Protection Clauses of the fourteenth amendment. The Supreme Court decided the case on due process grounds and expressly *declined* to reach the equal protection claim. 407 U.S. at 497 n. 5, 92 S.Ct. at 2165 n. 5. The Court in *Castaneda v. Partida* held that the contested grand jury selection process violated the Equal Protection

Clause. 430 U.S. at 501, 97 S.Ct. at 1283–84. Courts adjudicating challenges to federal procedures have so far relied upon these two cases, rather than upon cases involving challenges to federal procedures, to resolve standing questions.

10. None of the other defendants are either black or Hispanic.

rowed to challenge only the underrepresentation of Hispanics.

Three arguments support adoption of a narrow standing requirement. First, this court has already indicated that it will use the substantive test articulated in *Castaneda* when ruling on the merits of Mariotta's motion. *See supra* p. 648. Consistency would seem to dictate that the court also apply the standing requirement enunciated in that case.

Second, unless the standing requirement stated in *Castaneda* is treated as dicta, there would seem to be little doubt that defendants alleging denial of equal protection because of discriminatory *state* jury selection procedures have standing only if they belong to the excluded class. *Castaneda* expressly states as much. Moreover, in *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), a habeas corpus case challenging the method used to select grand jury forepersons in Tennessee, the Supreme Court appeared to reaffirm and apply *Castaneda*'s narrow rule of standing. In deciding whether respondents in *Rose* had established the first element of the *prima facie* case set forth in *Castaneda,* the Supreme Court expressly found that "respondents, as Negroes, [were] members of a group recognizable as a distinct class capable of being singled out for different treatment under the laws." *Rose,* 443 U.S. at 565, 99 S.Ct. at 3005. This application of the "same class" requirement in *Rose* was especially striking in light of the opinion's extensive discussion of the harms caused by grand jury discrimination not only to the defendant but "to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." 443 U.S. at 556, 99 S.Ct. at 3000. The Court seems implicitly to have concluded that the equal protection clause is not the appropriate vehicle for vindicating the more general social harms. Adoption of a broader rule in fifth amendment cases would appear to bestow an unfair advantage on federal defendants solely because of the identity of their prosecutor. On the other hand, because the defendants in both *Castaneda* and *Rose* were members

of the allegedly excluded classes, the Court did not need to decide the standing question, and for this reason the Eleventh Circuit has treated the comments on standing in both of those cases as dicta. *See Cross,* 708 F.2d at 633.

Finally, the Supreme Court in *Peters* appears to have been responding to a technical problem that does not plague Mariotta or his co-defendants. As the Supreme Court explicitly acknowledged, 407 U.S. at 500, 92 S.Ct. at 2167, Peters was barred from raising a sixth amendment claim only because he had been tried in state court before the Supreme Court decided *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (holding that the sixth amendment applied to the states). The Supreme Court, confronting Peters' petition for *certiorari* after the decision in *Duncan* had been rendered, evidently circumvented this legal barrier by using the rubric of the due process clause to address the concerns that would ordinarily have been met by a sixth amendment claim. Because the broad standing rule in *Peters* appears to have been inspired primarily by the peculiar circumstances of Peters' case, it might not appropriately be extended to cases such as the present one, in which the defendant may, and does, invoke the sixth amendment.

On the other hand, in deciding a race discrimination claim by a white male pursuant to the due process clause, the Supreme Court has explicitly extended the principle of a representative jury "to permit any defendant to challenge the arbitrary exclusion from jury service of his own or any other class." *Peters,* 407 U.S. at 500 n. 9, 92 S.Ct. at 2167 n. 9 (citing *Ballard v. United States,* 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946); *Thiel v. Southern Pacific Co.,* 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946); and *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). The Court recently reaffirmed this principle in *Hobby v. United States,* 468 U.S. 339, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984). The petitioner in *Hobby* was a white male who asked the Court to reverse his conviction and dismiss the indictment

against him because of discrimination against blacks and women in the selection of grand jury forepersons. In ruling against Hobby, the Supreme Court repeatedly distinguished his claim from that in *Peters*. The clear implication of the decision was that if Hobby had alleged and shown discrimination in the selection of the grand jury, or discrimination in an aspect of the administration of justice equally as significant, he would have prevailed irrespective of his race and sex. The Court therefore appears to distinguish between the standing requirements for defendants bringing equal protection challenges to intentional discrimination in jury selection pursuant to the equal protection clause and those for defendants challenging such discrimination pursuant to the due process clause.[11] This court holds accordingly that the standing rule of *Peters* applies in cases challenging federal grand jury selection procedures.

*2. Elements of the Claim*

■ The Supreme Court describes the substantive requirements for proving a *prima facie* case of discrimination in grand jury selection as follows.

The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class. Finally, as noted above, a selection procedure that is susceptible of abuse or is not

racially neutral supports the presumption of discrimination raised by the statistical showing.

*Casteneda*, 430 U.S. at 494, 97 S.Ct. at 1280 (citations and footnote omitted). The first element of this test is more properly viewed as a standing requirement—one which, as the court showed above, is not applicable here. The only question that arises concerning application of the remainder of this test is whether a showing of susceptibility to abuse is *essential* to proving a *prima facie* case or instead merely *buttresses* the presumption of discrimination, which may be established on the basis of statistics alone. The Supreme Court's statement that "a selection procedure that is susceptible of abuse or is not racially neutral *supports* the presumption of discrimination raised by the statistical showing" seems clearly to indicate that the test should be construed to impose only two requirements. *See United States v. Hyde*, 448 F.2d 815, 825 (5th Cir.1971) ("When there is a complete absence or 'spectacular' underrepresentation of Negroes on juries, the courts have read the figures as establishing a prima facie case of purposeful discrimination...."), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972) *and United States v. Gruberg*, 493 F.Supp. 234, 245 (S.D.N.Y.1979) (suggesting that total exclusion or statistically substantial underrepresentation would be sufficient alone to establish a *prima facie* case but that a less significant disparity would have to be buttressed by evidence of susceptibility to abuse or lack of racial neutrality). Nevertheless, this court is bound by the interpretation given by the Second Circuit in *Alston v. Manson*, 791 F.2d 255, 257 (2d Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987), that "[t]he High Court established a tripartite analysis for analyzing [an equal protection]

---

**11.** The distinction correlates with the different interests protected by the two clauses. Whereas the equal protection clause is apparently not regarded as an appropriate mechanism for vindicating claims of injury to society as a whole, *see supra* p. 650, *Peters* and *Hobby* amply demonstrate that the due process clause *is*. Because discrimination in jury selection can cause different injuries—injuries that may be redressed

by appeal to different constitutional clauses— there are different tests for standing to assert equal protection and due process claims. On the other hand, there is no reason why proof of the discrimination should vary with the nature of the constitutional claim. Thus, the substantive test delineated in *Castaneda* may be applied in the present case even if its rule for standing is not germane.

claim." If defendant establishes a *prima facie* case, the burden shifts to the Government to rebut the inference of discriminatory intent.

The Second Circuit also ruled in *Alston* that "Statistical Decision Theory is an appropriate instrument for analyzing whether minority underrepresentation in the jury array is substantial." 791 F.2d at 257–58. By means of this theory, the statistician can calculate the probability that a particular observed outcome is due to random factors. *Id.* at 258. The *Alston* panel regarded this theory as ideally suited to equal protection analysis, which uses statistics to raise a presumption of discriminatory intent. The lower the odds that a state of affairs could reasonably be ascribed to chance, the stronger the inference of intentional discrimination. Having already borrowed equal protection rules regarding standing and the elements of a *prima facie* case for the purpose of Mariotta's fifth amendment claim, this court concludes that Statistical Decision Theory should be used to assess the second element of this claim.

The court finds that defendant has established the first two prongs of the *Castaneda* test. The court has assumed for the purpose of this motion that Hispanics are a cognizable group. In addition, the application of Statistical Decision Theory to the data accepted by the court reveals a substantial underrepresentation of both blacks and Hispanics under the test set forth by *Alston*. When the results of the various samples are combined,[12] the actual disparity between the percentage of blacks in the eligible population and that on the Master Jury Wheel is 3.6% and the comparable figure for Hispanics is 4.7%. The chances that these disparities would occur randomly are less than one in $10^{25}$ times and one in $10^{13}$ times, respectively.[13] Reply Memorandum in Support of Mariotta's Motion to Dismiss the Indictment, at 8. These fig-

ures clearly satisfy *Alston*'s test. Nevertheless, the court is obliged to grant the Government's motion because Mariotta has not established the third element of his *prima facie* case.

Mariotta has not demonstrated that any aspect of the Jury Plan is either racially non-neutral or susceptible of abuse. This case is therefore distinguishable from both *Castaneda* and *Alston*. In *Castaneda*, the Supreme Court held that the "key man" system of jury selection employed by the state of Texas, a system notoriously subject to discriminatory abuse, violated the equal protection clause. The Jury Plan at issue here, however, employs none of the subjective standards typically utilized by the key man system. The Second Circuit in *Alston* found that the Connecticut quota system favoring small towns was racially non-neutral because the "ineluctable effect of the statutory scheme was to reduce the number of potential jurors drawn from large towns, ... where it is undisputed that a larger proportion of blacks resided." 791 F.2d at 257. There is nothing "ineluctable" about the underregistration of blacks and Hispanics in the area served by the Manhattan courthouse. Mariotta has not alleged that either group has in any way been hindered or prevented from registering to vote. Blacks and Hispanics have been and are free to increase their representation on the Master Jury Wheel simply by exercising their right to register. The court therefore concludes that Mariotta has failed to prove a *prima facie* fifth amendment violation and hereby grants the Government's motion to dismiss this claim.

## B. The Sixth Amendment

The sixth amendment entitles a criminal defendant to "a speedy and public trial, by an impartial jury...." This right has been interpreted to impose a requirement that

---

**12.** To arrive at a single figure representing the percentage of blacks or Hispanics, rather than a series of figures representing the results of the different sampling methods, the sum of the number of persons identified by each technique as black or Hispanic may be divided by the sum of the number of persons providing answers as to race and ethnicity in each sample.

**13.** For any whole number n, "$10^n$" signifies the number that is obtained by multiplying 10 by itself n-1 times. The result would be expressed by writing a "1" followed by n zeroes. For example, $10^2 = 10 \times 10 = 100$ ("1" followed by two zeroes).

petit juries be drawn from a source that fairly represents the community from which the jurors are drawn. *See Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701–02, 42 L.Ed.2d 690 (1975). Although the sixth amendment's fair-cross-section test applies, strictly speaking, only to petit juries, the Supreme Court has banned, under the due process clause of the fifth amendment, exclusion of any "large and identifiable segment of the community" from either grand or petit juries. *Peters*, 407 U.S. at 503, 92 S.Ct. at 2169. As both parties to this case recognize, there is no "same class" standing requirement for asserting sixth amendment claims. *See Taylor*, 419 U.S. at 526, 95 S.Ct. at 595–96; *Peters*, 407 U.S. at 500, 92 S.Ct. at 2167.

To establish a *prima facie* violation of the "fair-cross-section" requirement,

> the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364, 99 S.Ct. at 668. The third prong of this test may apparently be satisfied merely by showing that substantial underrepresentation occurred over a significant period of time. *See id.* at 366, 99 S.Ct. at 669. The sixth amendment is thus understood to be stricter than the equal protection clause "because it forbids any substantial underrepresentation of minorities, regardless of whether the State's motive is discriminatory." *Alston*, 791 F.2d at 258–59.

This understanding of the sixth amendment is difficult to reconcile with the Second Circuit's recent decision in *United*

*States v. Young*, 822 F.2d 1234 (2d Cir. 1987). The *Young* court baldly declared: " 'The use of voter registration lists as the sole source of the names of potential jurors is not constitutionally invalid, absent a showing of discrimination in the compiling of such voter registration lists.' " *Id.* at 1239 (quoting *United States v. Gordon*, 493 F.Supp. 814, 820–21 (N.D.N.Y.1980), *aff'd*, 665 F.2d 478 (2d Cir.1981)).[14] This approach appears to obliterate the substantive distinction between the equal protection and sixth amendment tests, affirmed only a year earlier by the *Alston* court.

The *Young* decision also seems flatly contradictory of the Supreme Court's ruling in *Duren*. *Duren* unequivocally indicates that a "demonstration that a large discrepancy [between the representation of the group in the general population and its representation on jury venires] occurred not just occasionally, but [over a significant period of time] *manifestly indicates* that the cause of the underrepresentation was systematic." 439 U.S. at 366, 99 S.Ct. at 669 (emphasis added). This statement implies that "if the use of voter registration lists as the origin for jury venires were to result in a sizeable underrepresentation of a particular class or group on the jury venires, then this could constitute a violation of a defendant's 'fair cross-section' rights under the sixth amendment." *Bryant v. Wainwright*, 686 F.2d 1373, 1378 n. 4 (11th Cir.1982), *cert. denied*, 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983). *Duren* permits the defendant to focus solely on the composition of the venires over time, not on the intent of the registrars, in endeavoring to assemble that proof. *See Duren*, 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26 ("[I]n Sixth Amendment fair-cross-section cases, systematic disproportion itself demonstrates an in-

---

**14.** One might question the authority of *Gordon* in a sixth amendment context. The court in *Gordon* did not indicate whether defendants raised fifth or sixth amendment claims. It neither mentioned nor analysed the substantive tests associated with the two constitutional provisions. In making the quoted ruling, it relied upon cases that also did not distinguish between the two constitutional provisions, *see United*

*States v. Parker*, 428 F.2d 488 (9th Cir.), *cert. denied*, 400 U.S. 910, 91 S.Ct. 155, 27 L.Ed.2d 150 (1970), or that were actually decided pursuant to law *other than* the sixth amendment, *see Castaneda, supra* (ruling on an equal protection claim); *United States v. Freeman*, 514 F.2d 171 (8th Cir.1975) (ruling on a claim pursuant to the Jury Selection and Service Act).

fringement of the defendant's interest in a jury chosen from a fair community cross section."); *Alston,* 791 F.2d at 258 ("In an analysis pursuant to the sixth amendment, a disparity can constitute a *per se* violation of an accused's right to trial by jury.") (citing *Duren* ).

■ One might harmonize *Young* both with *Duren* and with *Alston* by noting that intent to discriminate is often established at least in part by showing substantial underrepresentation over time. *See Duren* 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26; *Turner v. Fouche,* 396 U.S. 346, 359, 90 S.Ct. 532, 539–40, 24 L.Ed.2d 567 (1970); *Bryant v. Wainwright,* 686 F.2d at 1376. If one raises a presumption of discrimination in jury selection by showing sizeable underrepresentation over time on the jury wheel, and the jury wheel is identical to the voter registration list, then, one might argue, the presumption carries over to the voter registration list. In other words, a showing of substantial underrepresentation over time on a jury wheel derived directly from voter registration lists would be tantamount to a (*prima facie*) showing of discrimination in compiling those lists. Although the Second Circuit has not explicitly endorsed this analysis, the approach is consistent with the argument in *Young.*[15] Discerning no other way to reconcile the Second Circuit and Supreme Court cases, this court adopts the above analysis for the purposes of the present sixth amendment claim: a showing of substantial and persistent underrepresentation of blacks and Hispanics will satisfy the requirements of both *Young* and *Duren.*

The parties dispute the proper method to be applied to determine whether any underrepresentation that might be shown is legally significant for sixth amendment purposes. Mariotta suggests that this court apply the Statistical Decision Theory employed in equal protection cases. The Government argues that the court must employ the test first stated in *United States v. Jenkins,* 496 F.2d 57 (2d Cir.

1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975), a case decided pursuant to the Jury Act.

On several occasions in the recent past, the Second Circuit has considered which test to apply in sixth amendment cases to determine whether minority underrepresentation is substantial. The first of these cases was *Anderson v. Casscles,* 531 F.2d 682 (2d Cir.1976). In that case, the court decided that a "panel consisting of approximately 2% black persons out of an eligible county black population of 4.4%" was not "so unrepresentative of the community from which it [was] drawn as to violate" the sixth amendment. *Id.* at 685. The court also noted that the disparity would not have been found substantial under *Jenkins* and that the sixth amendment imposed no greater duty than the Jury Act. *Anderson,* 531 F.2d at 685 n. 1. This footnote appears to be the basis of the Second Circuit's assumption in subsequent cases that the test to be applied in sixth amendment cases is the one articulated in *Jenkins. See United States v. Rosario,* 820 F.2d 584, 585 (2d Cir.1987) (assuming that the *Jenkins* test applies to sixth amendment claims); *Alston,* 791 F.2d at 258–59 (same); *LaChance, supra* (same).

*Jenkins* held that the substantiality of underrepresentation should be determined by assessing "the difference that would result in the absolute racial composition of the venire as a result of the underregistration of [the minority group in question] as voters." 496 F.2d at 65. In *Alston,* however, the Second Circuit acknowledged an apparent anomaly that results from relying on *Jenkins'* absolute numbers test for sixth amendment purposes while applying Statistical Decision Theory in equal protection cases. Although the sixth amendment is generally recognized to set forth a more stringent standard than the equal protection clause, disparities that would be deemed significant for equal protection purposes turn out not to violate the sixth

---

**15.** This court points out that the Second Circuit did not find that the *Young* defendants had shown substantial underrepresentation *over time.* Had there been an effort to show this, the Court might not have commented that the defendants had "not even attempted to establish discrimination with respect to the voter registration lists." *Young,* 822 F.2d at 1239.

amendment. *Alston*, 791 F.2d at 258. Given this anomalous result, the court speculated that "the absolute disparity approach employed in *Jenkins* may be outmoded and should be discarded." *Id.* at 259.

■ The Second Circuit again considered the appropriate test to be applied in sixth amendment cases in *United States v. Rosario*, decided just last June. Appellants in that case apparently also asked the court to apply Statistical Decision Theory to assess whether grand juries in the District of Connecticut represented a fair cross-section of the community. The panel expressly declined to discuss "what kind of submission might satisfy a 'standard deviation' test," *id.* at 585 n. 1, stating: "We see no reason to reexamine our holding in *Jenkins*," *id.* at 585. Consequently, this court will apply an absolute disparity test in deciding the present sixth amendment claim.

Applying this test to the figures accurately depicting the percentages of blacks and Hispanics on the 1984 Master Jury Wheel leads this court to conclude that defendant has not established a sixth amendment claim. As the court noted above, the data reveals only a 3.6% absolute disparity for blacks·and a 4.7% disparity for Hispanics. To eliminate completely disparities of this size, the Southern District would have to add to the typical jury panel only two additional blacks and from two to three additional Hispanics. Although these figures are slightly larger than those in *Jenkins*, they are not so great as to amount to a violation of the fair cross-section requirement. *Cf. Swain v. Alabama*, 380 U.S. 202, 208–09, 85 S.Ct. 824, 829–30, 13 L.Ed.2d 759 (1965) (holding that a 10% actual disparity was inadequate to prove an equal protection violation). The Government's motion to dismiss defendant's sixth amendment claim is therefore granted.

*C. The Jury Selection and Service Act*

The Jury Selection and Service Act of 1968 established for the first time a random and objective system of jury selection for the federal courts, designed to minimize the risk of conscious or unconscious discrimination in the selection of federal jurors. Congress declared its intention to secure an equal opportunity for all citizens to serve on federal juries in the first two sections of the new law. Section 1861 provides:

"It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is the further policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States...."

Section 1862 states: "No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States ... on account of race, color, ... [or] national origin...." To ensure compliance with these provisions, the Jury Act directs the district courts to use lists of actual or registered voters as the basic source of names of potential jurors, but requires that they "prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title." 28 U.S.C. § 1863(b)(2). The Jury Act thus both bars discrimination in jury selection and establishes an affirmative obligation on the part of the federal courts to ensure that jurors are drawn from a fair cross-section of the community. *See United States v. Fernandez*, 480 F.2d 726, 733 (2d Cir. 1973) (noting that the Jury Act "goes beyond prohibition of 'intentional' distortions and provides that in certain cases affirmative measures must be undertaken" to ensure fair representation on jury venires). "Substantial failure to comply" with these provisions is grounds for dismissal of a criminal indictment. 28 U.S.C. § 1867.

■ The Second Circuit's opinions interpreting the Jury Act closely resemble the sixth amendment cases discussed above. The apparent inconsistency between *Alston* and *Young* finds its twin in two cases

construing the Jury Act: *Jenkins* and *United States v. Guzman*, 468 F.2d 1245 (2d Cir.1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973). The appellant in *Guzman* claimed that the jury selection procedure of the Southern District violated the Jury Act because it resulted in underrepresentation of young people. The panel rejected this argument, reasoning:

> [i]n districts where obstacles are placed in the paths of certain citizens attempting to register to vote, the voting rolls must be supplemented to achieve a list reflecting a fair cross section of the community. But in the Southern District, where the asserted age group is entitled to register to vote and has done so (albeit in lower proportion than its percentage of the total population), we can find no systematic discrimination sufficient to require the use of alternative sources for jury lists.

*Id.* at 1248. In *Jenkins*, on the other hand, the Second Circuit did not permit the fact that "it [was] not claimed that there was any discrimination in the registration of voters or in the selection of the veniremen from the voter registration list," 496 F.2d at 64, to defeat a claim pursuant to the Jury Act. The panel recognized that voter registration lists "might not always provide a fair cross-section" and determined that "the question ... [was] whether the disparity in the present case was sufficient to mandate resort to a supplemental source." *Id.* at 64–65. In other words, *Guzman* implicitly held that a defendant alleging a Jury Act claim must prove intentional discrimination whereas *Jenkins* determined that proof of a substantial disparity alone established a statutory cause of action.

Awareness of the historical context in which the Jury Act was enacted lends credence to *Guzman*'s interpretation of that statute. After all, debates on these amendments followed shortly after passage of the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.* (1982). Those debates reflected Congress' appreciation of both the power and the limitations of the Voting Rights Act. Members assumed that vigorous enforcement of the Voting Rights Act would eradicate the overt discrimination in voter registration then customary in the South, but no one expected results overnight. As long as discrimination or its effects persisted, therefore, district courts would be required to supplement voter registration lists as the source of jury venires. Where discrimination in voter registration had never existed or had been eliminated, there would be no need to supplement the lists. *See* 114 Cong.Rec. 3998 (1968) (statement of Rep. Kastenmeier) (noting that "in time, with the continuing implementation of the Voting Rights Act, the need to employ supplemental sources will end"); *id.* at 4000 (statement of Rep. Tenzer) (same). Lists that were neutrally compiled, Congress found, would serve as a fair source of qualified jurors reasonably representative of the community from which they were drawn. *See* H.R.Rep. No. 1076, 90th Cong., 2d Sess. 4–6, *reprinted in* 1968 U.S. Code Cong. & Admin.News 1792, 1794–96 [hereinafter House Report] (noting that voter lists not only "provide the widest community cross section of any list readily available" but also offer an "initial line of defense against incompetence" among jurors); S.Rep. 891, 90th Cong., 1st Sess. 17 (1967). On this narrow view of the purpose of the Jury Act, Congress was not concerned to redress the underlying social and economic inequalities that were known to cause underregistration among minority groups but merely to ensure that discrimination in voter registration did not infect federal jury selection procedures. *See* 114 Cong.Rec. 3998 (statement of Rep. Kastenmeier) ("Minor distortions in the otherwise representative character of voter lists [caused by 'correlations between voting and education and education and income'] would not necessitate the use of supplemental sources."); *cf.* House Report, at 5, 1968 U.S.Code Cong. & Admin.News at 1795 (denying that economic or social characteristic prevent a person from registering to vote).

This court believes that this narrow view reflects an accurate understanding of Congress' intent, but *Jenkins*' broad interpretation of the Jury Act is not without sup-

port in the legislative history. For example, the House Report notes that although the "bill specifies that voter lists be used as the *basic* source of juror names," it requires that the lists "be supplemented by other sources *whenever* they do not adequately reflect a cross section of the community." House Report, at 4, 1968 U.S. Code Cong. & Admin.News at 1794 (emphasis added). The reasons for any underrepresentation of cognizable groups on jury venires thus appear to be of no significance. Moreover, the House Report seems expressly to reject the idea that supplementation is required only when disparities are the result of intentional discrimination. It "recognizes that in some areas voter lists of all kinds may be insufficient to implement the policies of the act, by reason of local *voting practices*. Where that is true, the plan must prescribe sources to supplement the voter lists." *Id.* at 10, 1968 U.S. Code Cong. & Admin.News at 1799 (emphasis added). "Voting practices" are not limited to exclusionary voter *registration* practices, and the phrase would seem to cover differential voting behavior irrespective of its cause. In sum, the panel in *Jenkins* could reasonably accept at face value the legislature's statement that *"any* substantial percentage deviations *must* be corrected by the use of supplemental sources." *Jenkins,* 496 F.2d at 65 (quoting House Report, at 5), 1968 U.S.Code Cong. & Admin.News at 1794 (emphasis added).

Since 1974, *Jenkins'* interpretation of the Jury Act has governed statutory jury discrimination claims in the Second Circuit. *See Rosario,* 820 F.2d at 585 & n. 1 (stating that *"Jenkins* remains the law in this circuit"); *LaChance,* 788 F.2d at 866 (declining appellant's invitation to "abandon and disregard *Jenkins* "); *Anderson,* 531 F.2d at 685 n. 1 ("Were this a case falling under the Act, our decision in *United States v. Jenkins, supra,* would be dispositive."). Indeed, none of the post-*Jenkins* Second Circuit cases involving statutory claims of jury discrimination even mention *Guzman.* This court will therefore focus exclusively on the question of the substantiality of any underrepresentation demonstrated by Mariotta in deciding the Jury

Act claim. *See Jenkins,* 496 F.2d at 64–65 ("The question before us is whether the disparity in the present case was sufficient to mandate resort to a supplemental source").

■ The reasons adduced for employing *Jenkins'* absolute disparity test in sixth amendment cases apply *a fortiori* to Jury Act claims. The court's finding for sixth amendment purposes that the underrepresentation demonstrated here is legally insignificant holds as well for the Jury Act claim. Because defendant has not shown that the Southern District has substantially failed to comply with the Jury Act, the Government's motion to dismiss the statutory claim is hereby granted.

## III. CONCLUSION

Defendant has not cited, and the court has been unable to locate, a single case invalidating a jury selection system that uses voter registration lists as the sole source of prospective jurors. The facts adduced here provide no basis for departing from this unbroken line of authority. At best they show a slight, but legally unimportant, underrepresentation of blacks and Hispanics on the 1984 Manhattan courthouse Master Jury Wheel. They do not begin to show that the Southern District has intentionally discriminated against these groups in its selection of grand or petit jurors. For these reasons, the court grants in full the Government's motion to dismiss Mariotta's constitutional and statutory claims of discrimination in juror selection.