UNITED STATES of America, Appellee,

v.

**Gary W. JACKMAN, Defendant–Appellant.**

**No. 133, Docket 93–1868.**

United States Court of Appeals, Second Circuit.

Argued Oct. 13, 1994.

Decided Jan. 17, 1995.

Jeremiah Donovan, Old Saybrook, CT, for defendant-appellant.

James Genco, Asst. U.S. Atty., Hartford, CT (Christopher F. Droney, U.S. Atty., New Haven, CT, on the brief), for appellee.

JoNel Newman, Hartford, CT, submitted a brief for amici curiae Connecticut Civil Liberties Union Foundation and Connecticut State Conference of NAACP Chapters.

Before: NEWMAN, Chief Judge, WALKER and CALABRESI, Circuit Judges.

JON O. NEWMAN, Chief Judge:

This appeal concerns a procedure adopted by clerical staff in the District Court for the District of Connecticut to remedy a jury selection process that had inadvertently, but systematically, excluded from petit jury venires all residents of Hartford and New Britain, communities with large minority populations. The adequacy of this procedure, no longer in use, is challenged by Gary W. Jackman on his appeal of judgment of the District Court (Alfred V. Covello, Jr., Judge), convicting him of bank robbery, in violation

of 18 U.S.C. § 2113(a).[1] Because the procedure used to select the venire from which Jackman's jury was selected violates the Sixth Amendment's fair cross-section guarantee, we reverse.

## Background

### A. Prior History of Jury Selection Process

In *United States v. Osorio*, 801 F.Supp. 966 (D.Conn.1992), Judge T.F. Gilroy Daly examined the jury selection procedures for the Hartford Jury Division of the District and found that all residents of the cities of Hartford and New Britain had been excluded from the Division's jury pool. Judge Daly ruled that the exclusion violated the Sixth Amendment guarantee of a fair cross-section of the community. At the time of the decision in *Osorio*, the Division's venires were, at least in theory, composed by following the Plan for the Random Selection of Grand and Petit Jurors, adopted December 4, 1989. *See Osorio*, 801 F.Supp. at 969–71.

The selection process under this Plan began with the construction of a "Master Wheel." This wheel was composed of ten percent of the names randomly chosen from the voter registration lists of each of the 84 towns and cities within the Hartford Division. From this Master Wheel of approximately 68,000 names, 1,500 names were randomly drawn twice each year, and jury questionnaires were sent to each of these names. When the questionnaires were returned, the jury clerk would divide the jurors into three categories: "qualified," "unqualified," and "uncertain." A district judge would review the clerk's assignments and make a final decision as to those in the "uncertain" category.

The names of those determined to be qualified were placed in the "Qualified Wheel," the source of prospective jurors for all grand and petit jury venires called for service in Hartford. When jurors were needed, names from the Qualified Wheel, which contained in excess of a thousand questionnaires, were selected at random, and jury summonses were mailed to those individuals.

The Hartford Qualified Wheel, however, contained what Judge Daly aptly characterized as "startling anomalies." *Id.* at 972. While the 1990 census indicated that 6.34% of the voting-age population in the Division is Black and 5.07% is Hispanic, Blacks accounted for only 3.08% of the individuals in the Qualified Wheel, and Hispanics accounted for only 0.77%. *Id.* at 972. Although at the time of *Osorio*, 4,631 juror questionnaires had been mailed by the clerk to voting-age residents whose names appeared on the Master Wheel, no questionnaire had ever been sent to a resident of Hartford or New Britain, the two largest cities in the Division. *Id.* at 972–73.

As a result, no resident of Hartford and New Britain was included in the Qualified Wheel, and none was ever summoned to serve in a venire. Because Hartford and New Britain contain 62.93% of the voting-age Black population and 68.09% of the voting-age Hispanic population in the Division, *id.* at 972, exclusion of residents of these cities from the Qualified Wheel resulted in a proportion of Blacks and Hispanics in the Qualified Wheel (the jury pool from which venires were selected) significantly lower than their proportion of the voting-age population.

At the time of the decision in *Osorio*, there was no explanation for the omission of Hartford and New Britain residents from the jury pool. Subsequently, it was discovered that no jury questionnaires were sent to Hartford residents because a computer programming error had caused the letter "d" in "Hartford" to communicate to the computer that all po-

---

1. Appellant also asserts a violation of the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.*, and challenges both the District Court's failure to order disclosure of certain evidence and its decision to admit an out-of-court statement pursuant to the residual hearsay exception of Fed.R.Evid. 804(b)(5). In addition, *amici curiae* urge that we consider an equal protection claim, which appellant raised unsuccessfully below in objecting to the jury selection process but which he appears to have abandoned on appeal. In light of our ruling on his fair cross-section challenge, however, we need not consider these other arguments for reversal. Since we are not considering Jackman's claim under the Jury Act, we express no view as to whether this claim was timely asserted under the Act or whether the District Court abused its discretion in denying a continuance to permit a full exploration of the claim before jury selection.

tential jurors from Hartford were deceased and thus unavailable for jury service. No explanation has ever been provided as to why the names of New Britain residents were never even entered into the computer.

To remedy this "systematic exclusion" of two-thirds of the Blacks and Hispanics in the Division, *id.* at 973–80, as well as to improve the overall fairness of the system, the District of Connecticut adopted a new jury selection plan. *See* Second Restated Plan for Random Selection of Grand and Petit Jurors Pursuant to Jury Selection and Service Act of 1968 (as amended) (D.Conn. Nov. 23, 1992) (requiring, among other things, that Master Wheels be drawn from both voter registration and motor vehicle operator lists).

In addition, the Qualified Wheel condemned in *Osorio* was abandoned and, as an interim measure until the Second Restated Plan could be implemented, the Clerk's Office directed the Yale University computer programmer responsible for the administration of the jury system to make sure that all names of New Britain residents drawn from voter registration lists were placed into the Master Wheel, and to correct the computer error that had led to the exclusion of Hartford residents. One thousand names were then drawn at random from the revised Master Wheel that included Hartford and New Britain residents, a jury questionnaire was sent to each name drawn, and, after elimination of unqualified and exempt persons, the remaining names constituted a new, representative Qualified Wheel. This interim measure, as such, is not challenged, but the Clerk's procedure for drawing names for venires in the aftermath of *Osorio* has precipitated the pending appeal. That procedure was explained at a hearing in appellant's case, to which we now turn.

## B.  Selection of Appellant's Venire

On September 14, 1993, the jury was scheduled to be selected for appellant's trial. Prior to the venire's entry into the courtroom, appellant objected to being required to select a jury from a venire that contained no Blacks and only a single Hispanic. Judge Covello instructed Jackman to file a written motion, but jury selection began, and a jury was selected from the venire as constituted.

On September 21, 1993, prior to the swearing of the jury, the Court conducted an evidentiary hearing on appellant's motion. Maria Carpenter, the jury administrator ("jury clerk") for the Hartford seat of court, testified that she maintained in her computer a pool of names of persons whom she contacted when a jury venire was required ("the Jury Clerk's Pool"). These names, which came from the Qualified Wheel, first entered the Jury Clerk's Pool from the summonses provided by the Yale computer programmer. Prior to the decision in *Osorio,* the clerk never received from the programmer a summons for anyone residing in Hartford or New Britain.

Upon the initial service of a summons upon a juror, the clerk would enter the juror's name into the Jury Clerk's Pool. Thereafter, she would notify the jurors in the Jury Clerk's Pool to appear for venire panels that were convened during the course of the two-year period following the juror's initial summons. The names of jurors remained in the Jury Clerk's Pool for two years or thirty days of service, after which the juror was dismissed. When the Jury Clerk's Pool required replenishing, the clerk obtained more summonses from the Yale programmer, who in turn obtained the names for these summonses from the Qualified Wheel.

When she was notified that a venire was required, the jury clerk would enter certain selection criteria into her computer in order to cull from the Jury Clerk's Pool a "picking list." This list, for example, omitted the names of jurors who had served the previous month. Before sending out letters notifying jurors to report, the clerk would remove from the "picking list" jurors whose two-year term of service was about to expire, jurors who had written to indicate that they would be out of state for business or a vacation, and jurors who were pregnant or who had just delivered a child.

The clerk reported that, after the *Osorio* decision and the abandonment of the old Qualified Wheel, Hartford and New Britain names were entered into the Master Wheel, from which a new Qualified Wheel was

drawn. However, this new Qualified Wheel did not become the exclusive or even the primary source of names for jurors, a circumstance that is the basis of appellant's Sixth Amendment challenge. The jury clerk did not create a new Jury Clerk's Pool from the new Qualified Wheel. Instead, when a venire was required, the clerk would first create a "picking list" from those names in her computer, all of which had come from the pre-*Osorio* Qualified Wheel. If there were not enough names on the "picking list" for a venire, the clerk would supplement the list with some additional names from the new Qualified Wheel that included Hartford and New Britain.

For appellant's jury selection, the clerk generated a "picking list" of 78 names from the Jury Clerk's Pool—a pool that excluded Hartford and New Britain residents. Needing to summon 100 persons in order to have a venire of adequate size show up for jury selection, she then added 22 names drawn from the new Qualified Wheel and sent out letters to all 100 individuals. Some of these individuals were excused, reducing the list of those summoned to 80 persons, among whom there was one Hispanic and no Blacks. Of the 74 potential jurors appearing in court, 62 (84%) were from the Jury Clerk's Pool (*i.e.*, drawn from the pre-*Osorio* list), and 12 (16%) were from the new Qualified Wheel. Two Hartford residents and four New Britain residents were in the venire. Two other Hartford residents were summoned, but did not appear in court.

At the September 21, 1993, hearing, the Government presented no evidence, but argued that the minority composition of appellant's venire was "an isolated, one time incident" and that the presence of six individuals from Hartford and New Britain sufficiently met appellant's concern. The District Court agreed, rejecting appellant's fair cross-section challenge on the ground that the presence of Hartford and New Britain residents on his venire demonstrated that "there was no systematic exclusion," and thus that the

problem identified in *Osorio* had been solved. Following the jury's guilty verdict on September 24, 1993, appellant raised his objections to the jury selection process again in a motion for a new trial, which the District Court denied.

On October 1, 1993, new Qualified Wheels constructed in accordance with the Second Restated Plan became available, and the Clerk's Office ceased to draw jurors from any pool that existed prior to that date.[2]

## Discussion

■ The Sixth Amendment requires that jury panels be drawn from a source representing a "fair cross section" of the community in which the defendant is tried. *Taylor v. Louisiana*, 419 U.S. 522, 536, 95 S.Ct. 692, 700–01, 42 L.Ed.2d 690 (1975); *United States v. LaChance*, 788 F.2d 856, 864 (2d Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986). This fair cross-section requirement applies only to the larger pool serving as the source of names and not to the petit jury. *See Taylor*, 419 U.S. at 538, 95 S.Ct. at 701–02 ("Defendants are not entitled to a jury of any particular composition."). In other words, the Sixth Amendment guarantees the *opportunity* for a representative jury venire, not a representative venire itself. *Roman v. Abrams*, 822 F.2d 214, 229 (2d Cir.1987), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1311, 103 L.Ed.2d 580 (1989).

■ On its face, the procedure adopted by the jury clerk to remedy the problem disclosed in *Osorio* appears to constitute systematic—though perhaps unintentional—exclusion. *Osorio* alerted the clerk to the fact that the old Qualified Wheel seriously underrepresented residents of Hartford and New Britain and consequently underrepresented Blacks and Hispanics. It was perhaps a defensible decision not to discard the names already drawn from that list and entered in the jury clerk's computer, names that had taken considerable citizen and staff time to assemble. But if the names drawn from the

---

**2.** Sometime after the September 21, 1993, evidentiary hearing in this case, then-Chief Judge Cabranes appointed a committee to examine and report upon the District's jury selection process. The findings of the committee's report confirmed that after *Osorio*, the clerk continued to draw names for each venire primarily from the pre-*Osorio* Jury Clerk's Pool, but supplemented those names when necessary by drawing from the new Qualified Wheel.

pre-*Osorio* list were not to be discarded, it should have been apparent that these names would have to be used with caution and that some adjustment in the procedure for selecting venires would have to be made to remedy the underrepresentation that *Osorio* had disclosed. Once the new Qualified Wheel was assembled, one way of continuing to use the names already drawn from the old Qualified Wheel and placed in the Jury Clerk's Pool would have been to select names at random from the new Qualified Wheel, and then add to the Jury Clerk's Pool Hartford and New Britain residents drawn from the new Qualified Wheel in sufficient numbers so that the Jury Clerk's Pool would reflect the percentages of Hartford and New Britain residents in the population of the Hartford Division.[3] Whatever procedure was used, effective steps needed to be taken to assure that the pool from which names for venires would be drawn would no longer reflect the underrepresentation that *Osorio* had disclosed.

Unfortunately, an adequate procedure was not adopted. Instead, the jury clerk used the Jury Clerk's Pool, derived from the old Qualified Wheel that had totally excluded Hartford and New Britain residents, as a source of names for her "picking list" and supplemented her "picking list" in an entirely unacceptable manner. She drew from the new Qualified Wheel only the number of additional names that she needed in order to have a sufficient total number of persons to be summoned. Her remedy was bound to fail. Since the new Qualified Wheel was presumably representative and the old Qualified Wheel was definitely not, any random selection of names derived from both the old wheel and the new wheel, without some careful adjustment, would inevitably produce a "picking list" that permitted the underrepresentational effect of the old list to continue to taint the "picking list."

But the jury clerk's remedy was deficient beyond the mere use of the old unmodified list. Her approach made that list her *primary* source of names and supplemented it only to a slight extent. If the new Qualified Wheel had contributed most of the names to the "picking list," the underrepresentational effect of using the names derived from the old list might have been so diluted that the resulting degree of underrepresentation in a typical "picking list" might have been negligible. But by making minimal use of the new list, the clerk assured that the underrepresentativeness of the old list would significantly taint each "picking list."

In sum, the jury clerk started out with an unrepresentative pool of names and continued to use it so extensively, without sufficient adjustment, as to assure that her interim "system" would remain substantially unrepresentative. In focussing on the clerk's actions, we do not mean to fault her individually or to fix responsibility for what occurred. Her *actions* are necessarily what we must review. But responsibility is another matter, one that is understandably not clear on this record, but is also of no relevance to the validity of appellant's contention. Since the inadequacy of the procedure used was plainly accomplished by action within the Court, what occurred presents a cognizable constitutional claim. The responsibility might not be the clerk's at all, it might be someone else's, or, as often happens in overburdened courts (like other institutions), the failure to adopt a proper procedure might have resulted simply from the unwarranted assumptions by all concerned—in this instance, judges and staff—that the problem was being solved.

■ The facial inadequacy of the interim procedure adopted in the Hartford Division seems sufficient to sustain appellant's claim. But, since the District Judge has ruled that the procedure, as applied in appellant's case, yielded an adequate result, we proceed to analyze appellant's claim in terms of the specific result. As Judge Covello recognized, to establish a *prima facie* violation of the Sixth Amendment, a defendant must prove that: (1) the group claimed to be excluded is distinctive in the community, (2) the representation of the group in the jury pool is not fair and reasonable in relation to the number of members of the group in the

---

3. Perhaps some adjustment of this solution, such as entering names in the Jury Clerk's Pool and also returning them to the new Qualified Wheel, might have been necessary to avoid creating underrepresentation in the new Qualified Wheel.

community, and (3) the underrepresentation is the result of systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668–69, 58 L.Ed.2d 579 (1979). The defendant need not prove discriminatory intent on the part of those constructing or administering the jury selection process. *See id.* at 368 n. 26, 99 S.Ct. at 670; *Alston v. Manson*, 791 F.2d 255, 258 (2d Cir.1986), *cert. denied*, 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987).

■ There is little question that both Blacks and Hispanics are "distinctive" groups in the community for purposes of this test. *United States v. Biaggi*, 680 F.Supp. 641, 648 (S.D.N.Y.1988), *aff'd*, 909 F.2d 662 (2d Cir.1990), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991).

The second element requires the Court to determine whether either or both of these two "distinctive" groups are "significant[ly] underrepresent[ed]" in the jury selection process. *Biaggi*, 909 F.2d at 677. The relevant comparison, for purposes of assessing the representativeness of the system, would normally be between the number of minority persons in the population and the number of persons belonging to the class found in the jury pool. *See Duren*, 439 U.S. at 365–66, 99 S.Ct. at 669–70; *LaChance*, 788 F.2d at 868. This case is unusual, however, because unlike *Osorio*, where the exclusive source of potential jurors was the old Qualified Wheel (which in turn generated the Jury Clerk's Pool), here there was no single "pool" from which the jury clerk drew names to create a final "picking list." Instead, as names were needed to summon each venire, the clerk would take names from the Jury Clerk's Pool, which still excluded Hartford and New Britain residents, and add a few names from the new Qualified Wheel, which included

Hartford and New Britain residents, to make up for the shortfall.

Here, for example, the clerk took 78 names from the Jury Clerk's Pool and then added 22 names from the post-*Osorio* wheel. Apart from those 100 names, generated solely to create a "picking list" for summoning appellant's venire, there is no larger pool or pre-established source list that can be examined to determine the overall representativeness of the system with respect to either Hartford and New Britain residents or Blacks and Hispanics.

To assess the representativeness of the "picking list" procedure, the *amici curiae* suggest that we should examine what they call a "functional wheel," a construct reflecting the wheel that would be assembled by drawing names from the old Qualified Wheel and the new Qualified Wheel in the same proportion as those wheels served as the source for the 100 names on appellant's "picking list," *i.e.*, 78% from the old Qualified Wheel and 22% from the new Qualified Wheel. In this "functional wheel," the *amici* calculate, Blacks would be 3.8% and Hispanics would be 1.72%. These figures yield slightly smaller variations from the corresponding proportions of adults in the relevant population than occurred in *Osorio*, reflecting the 22% contribution of the new Qualified Wheel. Apprehending that under the so-called "absolute numbers"[4] or "absolute impact" approach, *see United States v. Biaggi*, 909 F.2d at 678; *United States v. Jenkins*, 496 F.2d 57, 65 (2d Cir.1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975), the underrepresentation in the "functional wheel" might not be regarded as substantial, *amici* urge us not to use the "absolute numbers" approach in this case. We agree that this approach, even as

---

4. The absolute numbers approach is a measure of the degree of underrepresentation accomplished by determining how many individuals from the distinctive group would have to be added to a randomly drawn venire to make that venire representative with respect to the excluded or underrepresented group. *See Jenkins*, 496 F.2d at 65. The analysis involves two steps. First, the Court must calculate "the difference between a group's proportion of the population and its proportion in the relevant jury pool."

*United States v. Gerena*, 677 F.Supp. 1266, 1271 (D.Conn.1987), *aff'd*, *United States v. Maldonado–Rivera*, 922 F.2d 934 (2d Cir.1990), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). Next, that percentage difference is multiplied by the size of a typical venire in order to determine the number of individuals from the distinctive group that have to be added to the venire, on average, to redress the group's underrepresentation. *Id.*

applied to the construct of the "functional wheel," is inappropriate.

First, in *Biaggi* we recognized that the absolute numbers approach is of questionable validity when applied to an underrepresented group that is a small percentage of the total population, because an underrepresentation of such a group that can be "remedied" by adding only one or two members to a typical venire can lead to the selection of a large number of venires in which members of the group are substantially underrepresented or even totally absent. *See Biaggi,* 909 F.2d at 678. This problem is particularly acute here because of the small percentage of voting-age Blacks and Hispanics residing within the Hartford Division (6.34% and 5.07% respectively, as compared with 19.9% and 15.7% within the Manhattan Master Wheel of the Southern District of New York in *Biaggi* ).[5] *See Osorio,* 801 F.Supp. at 978–79.

Second, although we tolerated the disparities in *Biaggi,* we noted that the degree of underrepresentation there "press[ed] the *Jenkins* 'absolute numbers' approach to its limit" and that we "would find the Sixth Amendment issue extremely close if the underrepresentations had resulted from any circumstance less benign than use of voter registration lists." *Biaggi,* 909 F.2d at 679. The facts in this case reveal circumstances far less benign than those in *Biaggi* or, indeed, even those in *Osorio,* where the apparently inadvertent exclusion of Hartford and New Britain residents had not previously been discovered. The underrepresentation of Hartford and New Britain residents continued for more than a year after disclosure of constitutional infirmities in the selection process. The procedure adopted in the aftermath of *Osorio* was not designed to assure fair representation of either the populations of those cities or the significant minority populations living there. Names from the pre-*Osorio* wheel remained the principal source of potential jurors and were supplemented only to the limited extent necessary to satisfy the need for enough jurors to fill out a venire, rather than in sufficient numbers to assure that the selection system would adequately reflect a cross-section of the community.

The more basic flaw in trying to justify what occurred in appellant's case by an absolute numbers approach is that, as stated earlier, there does not exist a pool, larger than the various "picking lists," that was uniformly used as the source for venires. And if we regard appellant's "picking list" as the source, we lack the data to show the demographic breakdown of that list. What is left is appellant's venire, on which we know

---

**5.** A brief review of some pertinent numbers makes the point more precisely.

If we assume a 75–person venire, in *Biaggi,* a perfectly representative wheel for jury selection would have yielded only a .0003% chance that a particular venire would have no Hispanics, while the actual wheel created a .016% chance of no Hispanics in any given venire. In other words, with either wheel in *Biaggi,* the likelihood of a venire with no Hispanics was minimal. In this case, however, if we use for purposes of argument the numbers derived from the "functional wheel" suggested by the *amici,* a perfectly representative wheel would have yielded only a 2% chance that a particular venire would have no Hispanics, while the functional wheel created a 27.2% chance of no Hispanics in any given venire. Thus, while a perfectly representative wheel would exclude Hispanics in only one out of every fifty venires, the technique used in this case would do so in more than one out of every four venires. Moreover, the wheel used in *Biaggi* created only a 2.88% chance that any given venire would have less than one-fourth of the number of Hispanics that would appear in a representa-

tive venire, while the functional wheel, appropriate for analysis in this case, created a 62.94% chance of such a substantially underrepresentative venire.

The corresponding statistics for Blacks are not quite as dramatic, but they reflect a similar pattern in the likelihood of substantial underrepresentation, and reveal similar differences between this case and *Biaggi.* These numbers demonstrate that, due to the relatively small size of the relevant minority populations here, appellant's *opportunity* for a representative jury venire in this case was dramatically worse than the defendant's *opportunity* for a representative jury venire in *Biaggi* —a case that we said was at the very edge of acceptability.

For a review of the relevant formulas used to derive these figures (all of them mathematical measures commonly employed in statistical analysis), see generally Michael O. Finkelstein & Bruce Levin, *Statistics For Lawyers* (1990), Peter A. Detre, Note, *A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel,* 103 Yale L.J. 1913 (1994), and D.H. Kaye, *Statistical Analysis in Jury Discrimination Cases,* 25 Jurimetrics J. 274 (1985).

there were no Blacks and only one Hispanic. The absolute numbers approach, even if otherwise applicable, cannot save underrepresentation to that degree, at least where no broad source of names exists to support the argument that the representations in the venire selected in any one case were only slight departures from the representations in average venires that would regularly be selected.

For all of these reasons, we conclude that appellant has shown a significant level of underrepresentation of Blacks and Hispanics for purposes of the Sixth Amendment.

We also conclude that appellant has established that this underrepresentation was the result of a "systematic exclusion in the jury-selection process," *Duren*, 439 U.S. at 366, 99 S.Ct. at 669, specifically the clerk's decision to select most potential jurors from the pre-*Osorio* Jury Clerk's Pool. Like the prior total exclusion of Hartford and New Britain residents from the jury pool, the underrepresentation here "was quite obviously due to the system by which juries were selected." *Id.* at 367, 99 S.Ct. at 670. The fact that appellant's venire included some residents of Hartford and New Britain (6 out of 74 or only 8.1%, compared to the 16.6% in the relevant population) does not defeat appellant's challenge, since the existence of systematic underrepresentation turns on the process of selecting venires, not the outcome of that process in a particular case.

In sum, we conclude that appellant has established a *prima facie* fair cross-section violation. Though the Government is entitled to attempt to rebut appellant's claim by demonstrating a significant interest in the procedure used, *see Duren*, 439 U.S. at 367, 99 S.Ct. at 670, no such interest has been shown here. The Government has provided no justification for failing to make the Jury Clerk's Pool more representative of the community, or for continuing to rely on the pre-*Osorio* old Qualified Wheel as the primary source of names, with only a sporadic supplementation unrelated to achieving proper representation. Since the Government has failed to rebut appellant's *prima facie* showing, the underrepresentation of Blacks and Hispanics as a result of the underrepresentation of residents from both Hartford and New Britain in the jury selection system violated appellant's Sixth Amendment right to a fair cross-section of the community on his jury venire.

We note, however, that our ruling will not necessarily jeopardize judgments from other cases that were tried during this same period using the old Jury Clerk's Pool. This is not a case "where the public's interest in enforcing judgments outweighs its interest in broad participation in the administration of justice." *Osorio*, 801 F.Supp. at 976. Thus, in the absence of a timely objection to the jury selection process, courts will retain the discretion to uphold convictions.

## Conclusion

We reverse appellant's conviction and order a new trial.

WALKER, Circuit Judge, dissenting:

Gary Jackman's venire was clearly the product of the misfeasance (although, as the majority notes, not malfeasance) of the Hartford jury clerk's office. Jackman appears to have had a clear remedy for this wrong under the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.*, but he failed to make a timely and sufficient motion to vindicate his statutory rights. He also had a colorable equal protection argument under the Fifth Amendment as the third-party proponent of the rights of prospective minority jurors, but he did not argue that theory to the district court and abandoned even his first-party Fifth Amendment claim on appeal. In giving Jackman a remedy despite these defaults, the majority disregards the standards applied uniformly across the circuits for determining Sixth Amendment violations. Because I believe that the Sixth Amendment should not be invoked to correct jury selection errors that have only a *de minimis* effect on a criminal defendant's right to a representative jury venire, I respectfully dissent.

## I. The Jury Selection and Service Act

Jackman would appear to have had a statutory remedy here had he complied with the procedures mandated by the Jury Selection

and Service Act (the "Act"), 28 U.S.C. § 1861 *et seq.* The statutory protections go beyond the remedy available under the Sixth Amendment. However, the fact that Jackman is procedurally barred from relief under the Act does not justify the alteration of Sixth Amendment jurisprudence undertaken by the majority. Because my point is underscored by the availability of a statutory remedy to a defendant in Jackman's position who advances his claim in a timely and sufficient manner, some elaboration of the statutory issue is useful.

The objective of the Act is to secure in federal courts a trial by a jury "selected at random from a fair cross section of the community," 28 U.S.C. § 1861, from which no citizen is excluded on the basis of invidious discrimination, 28 U.S.C. § 1862. *See United ed States v. Jenkins,* 496 F.2d 57, 64 (2d Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). To that end the Act provides that federal district courts must devise a plan for random selection of grand and petit jurors, 28 U.S.C. § 1863, and sets forth procedures for drawing names from a master wheel and summoning, qualifying, and impaneling jurors for service, 28 U.S.C. §§ 1864–66. The Act also permits criminal defendants to move to dismiss the indictment or stay proceedings "on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury." 28 U.S.C. § 1867(a).

Jackman attempted to obtain such relief in this case. On the morning that jury selection was to begin, Jackman's counsel discovered that his venire contained one Hispanic and no African Americans. Counsel promptly made an oral motion objecting to selection of a jury and, according to Jackman's brief, "was prepared, orally, to set forth a sworn statement of facts concerning the lack of black and Hispanics in the venire" in an effort to comply with the Act. The district court instructed him instead to file a written motion and then began the voir dire. Thereafter, Jackman filed a written motion within seven days of his first obtaining access to the juror questionnaires, which he asserts is the earliest he could have discovered a violation of the Act with diligence. The motion raised

claims under the Act, the Fifth Amendment, and the Sixth Amendment. The district court rejected that part of the motion which relied on the Act as untimely.

The Act requires that a motion seeking a dismissal of the indictment or stay of the proceedings must be filed "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier." 28 U.S.C. § 1867(a). The statute also requires that the motion contain "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title." 28 U.S.C. § 1867(d).

Both Jackman's oral and written motions were deficient under the Act, although for different reasons. His oral motion before voir dire complied with the timing requirements of the Act, but was substantively inadequate. The substantive defect is not, as the government contends, that Jackman failed to file a written motion. Oral testimony establishing noncompliance has been held sufficient. *See United States v. Calabrese,* 942 F.2d 218, 222 (3d Cir.1991) (forgiving lack of written statement when defendant presented sworn testimony of clerk about exclusionary practices). Rather, the defect is that, even if the district court had allowed Jackman to present his oral motion in full, his motion did not contain a "sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title." 28 U.S.C. § 1867(d). By his own admission, Jackman was prepared only to swear that minorities were underrepresented in his venire. This fact standing alone does not constitute a violation of the Act. Therefore, at the time of the oral motion before voir dire, Jackman could not make any allegation of statutory noncompliance.

After further investigation, Jackman did file a sworn statement of noncompliance in his written motion of September 20, 1993. Even assuming *arguendo* that this motion was filed seven days after he could have discovered noncompliance with diligence, it was untimely. The Act by its terms makes the beginning of voir dire the final deadline for filing a motion. The defendant must file

his motion either before voir dire or seven days after the violation is discovered or could have been discovered, "whichever is earlier." 28 U.S.C. § 1867(a). Thus, the provision allowing for a motion seven days after discovery of irregularities is not a reprieve from the voir dire deadline, but an additional timing restriction.

Jackman's very able attorney is not to be faulted for failing to make a timely and sufficient motion, toiling as he was under the resource constraints any appointed counsel faces. His efforts were not unreasonable under the circumstances. But the timing restrictions of § 1867(a) place an exacting duty on defendants to inquire about the adequacy of jury selection methods before voir dire. This case is not one in which the defendant was affirmatively denied the opportunity to develop a record of violations of the Act. Cf. Test v. United States, 420 U.S. 28, 30, 95 S.Ct. 749, 750–51, 42 L.Ed.2d 786 (1975) (per curiam) (holding denial of request to inspect jury lists to be reversible error). During the three months in which jury selection was delayed at his request, Jackman could have inquired into the post-Osorio selection processes used before the new plan was fully implemented. Jackman could also have reviewed the jury questionnaires from his venire upon their availability on September 10, made a preliminary inquiry of the interim procedures used by the jury clerk's office, and filed a motion for continuance prior to the assembly of the venire for jury selection.

We have stated that district courts should liberally grant continuances when some evidence of impropriety in jury selection is proffered, United States v. Fernandez, 480 F.2d 726, 731 n. 7 (2d Cir.1973) (Friendly, C.J.), and I see the issue whether the failure to do so here was an abuse of discretion as somewhat close. Unlike the defendant in Fernandez, however, Jackman had no evidence of wayward procedures at the time of his oral motion. While it may generally be advisable for a district court to grant a continuance when the underrepresentation of minorities is as stark as it was on Jackman's venire, I cannot say that Judge Covello in this instance, with a venire already assembled,

abused his discretion in not delaying voir dire so that Jackman could gather evidence for his motion. See United States v. Whiting, 538 F.2d 220, 222 (8th Cir.1976) (finding no abuse of discretion for trial judge to deny continuance to defendant who received copy of jury panel six days prior to trial). Since he failed to make a sufficient motion before voir dire, Jackman forfeited his rights under the Act. See United States v. LaChance, 788 F.2d 856, 870 (2d Cir.) (finding motion insufficient for failure to demonstrate noncompliance), cert. denied, 479 U.S. 883, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986).

If Jackman's statutory challenge had not been procedurally barred, he likely would have prevailed on that claim. While Jackman would have to show, inter alia, a substantial underrepresentation of a cognizable minority to prevail under the Sixth Amendment, a burden that I believe was not met here, his statutory remedy was not so limited. The Act offers relief for any substantial non-compliance with its provisions. 18 U.S.C. § 1867(a). One provision of the Act requires that a district's procedures "shall ensure that ... each ... political subdivision within the district or division is substantially proportionally represented in the master jury wheel." 28 U.S.C. § 1863(b)(3). In my view, the patent, non-random exclusion of Hartford and New Britain residents by the jury clerk's use of a defective wheel would have sufficed to prove a violation of § 1863(b)(3), independent of the effect on the representation of racial minorities. Cf. United States v. Gregory, 730 F.2d 692, 699–700 (11th Cir.1984) (entertaining claim of violation of § 1863(b)(3) but finding no evidence of violation), cert. denied, 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); United States v. Foxworth, 599 F.2d 1, 4 (1st Cir. 1979) (same).

Thus, this is not a case in which an unacceptable jury selection practice is without a remedy in the law. If Jackman had properly complied with statutory procedures, he very likely could have obtained the relief he seeks under the Jury Selection and Service Act.

## II. Constitutional Claims

Turning now to the constitutional claims, I think the majority errs in its unprecedented

holding that a violation of the Sixth Amendment can occur with something less than a showing of substantial absolute disparity between a group's representation in the jury wheel and its representation in the voting-age population. Without such a showing, the criminal defendant whose rights under the Sixth Amendment are at issue has not been wronged. If any wrong occurred in this case, recent caselaw tells us that it was to the African Americans and Hispanics who were excluded from jury service. That wrong, however, is not redressable under the Sixth Amendment; it is redressable, if at all, only as an equal protection claim under the Fifth or, in cases involving state jury selection, Fourteenth Amendment. Nevertheless, although Jackman could have done so, he raised no equal protection claim on behalf of those minority jurors.

A. *Sixth Amendment*

In *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court established a three-part *prima facie* test for evaluating fair-cross-section claims. In such cases, the defendant must prove:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364, 99 S.Ct. at 668. The defendant does not have to prove intentional discrimination. *United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir.1990), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991). Once the defendant satisfies the *prima facie* test, the burden shifts to the State to justify its practice by "showing attainment of a fair cross section to be incompatible with a significant state interest." *Duren*, 439 U.S. at 368, 99 S.Ct. at 671.

I agree with the majority that there is no colorable dispute in this case over the first and third prongs of the *Duren* test. As to the first prong, Jackman claims that African Americans and Hispanics were excluded, and they are unquestionably cognizable groups. As to the third prong, the testimony clearly establishes that, because of the continued practice of using the old wheel, the exclusion of the majority of the African American and Hispanic populations in the district by virtue of the omission of Hartford and New Britain residents was "systematic—that is, inherent in the particular jury-selection process utilized." *Id.* at 366, 99 S.Ct. at 669.

As the majority correctly states, the controversy in this case solely concerns the second prong of *Duren*: whether "either or both of these two distinctive groups is 'significant[ly] underrepresent[ed]' in the jury selection process." *Ante* at 1246 (brackets in original) (quoting *Biaggi*, 909 F.2d at 677). We have held that the determinant of underrepresentation for Sixth Amendment purposes is the absolute disparity test. *Biaggi*, 909 F.2d at 678; *Jenkins*, 496 F.2d at 66; *cf. Duren*, 439 U.S. at 364–66, 99 S.Ct. at 668–70 (finding "gross discrepancy" of roughly 30% between representation of women in population and jury wheel to satisfy second prong of test); Peter A. Detre, Note, *A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel*, 103 Yale L.J. 1913, 1919 (1994) ("While not explicitly endorsing any of the mathematical tests, the [*Duren*] Court seems to have considered only absolute disparity."). Under the absolute disparity test, the court looks to the percentage difference between the group's representation in the jury wheel and its representation in the population. *See Jenkins*, 496 F.2d at 65.

Since no single jury wheel was used as the source of Jackman's venire, I agree with the majority that we must determine underrepresentation by examining a weighted "functional wheel," which reflects the fact that 78 of the 100 names from which Jackman's venire was selected were drawn from the defective pre-*Osorio* wheel and 22 of the 100 were drawn from the post-*Osorio* wheel. African Americans and Hispanics comprised 3.8% and 1.7% of the functional wheel respectively, compared to a representation of 6.3% and 5.1% in the voting age population of the Hartford District as of the 1990 census.

Thus, the absolute disparity of representation in the wheel versus the voting age population was 2.5% for African Americans and 3.4% for Hispanics. In *Biaggi*, we found disparities of 3.6% for African Americans and 4.7% for Hispanics, both higher than those here, to be insubstantial. 909 F.2d at 677, 678; *see also United States v. McAnderson*, 914 F.2d 934, 941 (7th Cir.1990) (finding absolute disparity of 8% *de minimis*); *United States v. Pepe*, 747 F.2d 632, 649 (11th Cir. 1984) (7.6% *de minimis*); *United States v. Butler*, 611 F.2d 1066, 1069–70 (5th Cir.) (8.69% and 9.14% *de minimis*), *cert. denied*, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980). Moreover, in *Biaggi*, we examined the "absolute impact", *see* Detre, *supra*, at 1917, of the disparity on the average venire and found it insignificant under the Sixth Amendment that two African Americans and two to three Hispanics would have to be added to a venire of 60 persons to make it representative, 909 F.2d at 678. Here, only one to two African Americans and two Hispanics would have to be added to such a venire to make it mirror the population. The majority nonetheless finds that the low levels of disparity present in this case satisfy *Duren's* second prong.

This conclusion is at odds with every decision in every circuit applying the *Duren* test. Although the Supreme Court has declined to announce precise mathematical standards for determining underrepresentation, *Alexander v. Louisiana*, 405 U.S. 625, 630 & n. 9, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972) (equal protection claim), the Third Circuit, after recently surveying the relevant cases, did not list or mention any decision in which a court has concluded that the underrepresentation of *any one group* is substantial when the absolute disparity was less than 10%. *Ramseur v. Beyer*, 983 F.2d 1215, 1231 (3d Cir.1992) (en banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). I have discovered no case before or since *Ramseur* holding a lesser disparity cognizable, and the majority cites none. In fact, prior to *Ramseur* four circuits have expressly indicated that an absolute disparity of less than ten percent does not constitute substantial underrepresentation. *See McAnderson*, 914 F.2d at 941; *United States v. Rodriguez*, 776 F.2d 1509, 1511 (11th Cir.1985); *United States v. Clifford*, 640 F.2d 150, 155 (8th Cir.1981); *United States v. Test*, 550 F.2d 577, 587 (10th Cir.1976). The Ninth Circuit has rejected the notion that showings of slight underrepresentation of multiple groups can be aggregated to show a fair-cross-section violation. *See United States v. Suttiswad*, 696 F.2d 645, 649 (9th Cir.1982) (holding that absolute disparities of "2.8% for Blacks, 7.7% for [Hispanics], and 4.7% for Asians" collectively do not constitute underrepresentation since "nonwhites" are not a cognizable group). While the majority, correctly in my view, does not seek to justify its conclusion by combining nonwhites, it is worth noting that 5.9% combined disparity in the representation of African Americans and Hispanics here does not even approach the 15.2% combined disparity rejected in *Suttiswad.*

I cannot agree with either reason the majority gives for its unprecedented decision that disparities of 2.5% and 3.4% constitute substantial underrepresentation under the Sixth Amendment. The majority's first reason is that the jury selection practice used here is "'less benign than use of voter registration lists.'" *Ante* at 1247 (quoting *Biaggi*, 909 F.2d at 678.) I find this rationale troubling. First, it elevates dicta in *Biaggi* into an element of the Sixth Amendment fair-cross-section test without any support for the "benign method" requirement in *Duren* or any other case. Second, the majority opinion does not define its "benign" standard other than by allowing for (1) the use of voter registration lists and, perhaps, (2) "mere inadvertence." *Ante* at 1247. While finding the circumstances here "far less benign" than the use of voter registration lists in *Biaggi* or the accidental omission of Hartford and New Britain residents in *Osorio*, *ante* at 1247, the majority seems to acknowledge that in this case there is no evidence of intentional discrimination, *ante* at 1244–45 (the exclusion of African Americans and Hispanics, while "systematic," was "perhaps unintentional"), or even a deliberate flouting of the *Osorio* court's order. It concedes that "[i]t was perhaps a defensible decision not to discard the names already drawn from the [pre-*Oso-*

*rio* ] list and entered in the jury clerk's computer, names that had taken considerable citizen and staff time to assemble." *Ante* at 1244–45. In essence, the majority's "benign method" standard is a negligence standard: the jury clerk failed to understand the import of *Osorio* and to exercise due care to ensure that its picking list adequately reflected the representation of African Americans and Hispanics in the community.

Finally, even if negligence somehow belongs in Sixth Amendment analysis, the majority fails to explain why governmental negligence compels us to dispense with the standards for determining substantial underrepresentation that every circuit has accepted. Unlike proof of substantial underrepresentation in the equal protection context, which is used to create a rebuttable inference of discriminatory purpose in jury selection, *see Castaneda v. Partida,* 430 U.S. 482, 494–95, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), the requirement of substantial underrepresentation in the second prong of *Duren* serves a function entirely independent of policing the selection methods used: it indicates whether there has been an impairment of the defendant's rights sufficient to justify the reversal of his conviction. If the representation of a group in a jury wheel, whatever its deficiencies, is "fair and reasonable in relation to the number of such persons in the community," *Duren,* 439 U.S. at 364, 99 S.Ct. at 668, then there is no violation of the defendant's Sixth Amendment rights even if the deficiencies result from governmental negligence or something "far less benign" than the use of voter registration lists. I would not endorse the recognition of a Sixth Amendment violation even in the face of deliberate governmental misconduct, much less the mere misfeasance that occurred here, if substantial underrepresentation could not be proven. The wrong of deliberate misconduct would have to be addressed under a Fifth Amendment claim.

The rule that emerges from the majority's opinion is that even a slight disparity may constitute a Sixth Amendment violation if some defect in the jury clerk's implementation of the selection plan contributes to that disparity. The majority shifts the focus of Sixth Amendment inquiry from the rights of the defendant to the proper functioning of the jury selection process, broadening considerably the type of practices that might constitute Sixth Amendment violations. But the majority fails to analyze what relief is appropriate under the new regime; it merely invokes the rule of automatic reversal, which is appropriate for substantial violations of a defendant's rights. If the majority's concern is systemic, it ought to consider other systemic interests, most notably society's interest in the finality of convictions and economy of judicial resources. Where there was no deliberate misconduct and no colorable effect on defendant's rights, why punish the government and the public by overturning this valid bank robbery conviction and imposing a retrial? Retrials are not only costly but highly problematic because witnesses may become unavailable or their memories may fade over time. Congress, the appropriate body to engage in the kind of policy weighing implicated by the majority's decision, struck a better balance in the Jury Selection and Service Act. It made relief available for a broad array of procedural defaults, but it limited that relief to defendants who make sufficient motions prior to voir dire, thus giving the district court the opportunity to arrest the proceedings at an early stage and thereby avoid the social cost of a trial that might be overturned on appeal. Finally, I note that the systemic interest that, according to the majority, will be served by a reversal is particularly slim in this case, since the district court moved swiftly to correct the problems caused by the jury clerk's interim procedures and to ensure that all future venires would be drawn from the post-*Osorio* wheel.

The second reason the majority advances to justify its dramatic departure from the accepted standards of underrepresentation is that the absolute disparity approach is "of questionable validity when applied to an underrepresented group that is a small percentage of the total population." *Ante* at 1247. This statement is sharply at odds with the more widely held view, which we endorsed in *Jenkins,* 496 F.2d at 65–66 (rejecting comparative disparity test), that the absolute disparity test is appropriate in such circum-

stances because it does not overstate the actual effect on the venire of underrepresentation of small groups. *See Pepe,* 747 F.2d at 649 n. 18; *United States v. Hafen,* 726 F.2d 21, 24 (1st Cir.), *cert. denied,* 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984); *United States v. Whitley,* 491 F.2d 1248, 1249 (8th Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974).

Even assuming that we should adopt a statistical measure that takes the size of the group into account, the majority fails to demonstrate that substantial underrepresentation occurred in this case. One measure that accounts for the size of the group in question is "disparity of risk," which is the percentage difference between the probabilities of drawing an unrepresentative jury from the actual wheel used and from a wheel that exactly mirrors the population. *See* Detre, *supra,* at 1930–1933. The majority provides some statistics on a variant of the disparity of risk test, *ante* at 1247 n. 5, but fails to provide any standard by which we can judge whether the probabilities it generates are constitutionally meaningful. One commentator has calculated that a disparity of risk standard of 37 percent is essentially equivalent to the absolute disparity standard of 10 percent commonly employed by the courts. Detre, *supra,* at 1936. But, as calculated by *amici* in this case, the disparity of risk of underrepresentation from use of the functional wheel is 17.2% for African Americans and 27.6% for Hispanics. Thus, even under a disparity of risk measure which accords with generally accepted norms of underrepresentation and does not treat small groups differently, there is no Sixth Amendment violation in this case.[1]

The real question here is not whether the systematic exclusion of groups that represent a small part of a local population may be constitutionally significant, but whether the Sixth Amendment provides a remedy for that exclusion. The Sixth Amendment protects a defendant's rights; it guarantees a venire drawn from a substantially representative jury wheel as one of the fundamental assurances of a fair trial. The gravamen of the majority's concern, I suspect, is not that Jackman was deprived of his rights, for any such deprivation was truly *de minimis.* Rather, it is that large segments of the African–American and Hispanic populations were systematically denied the right to be eligible for jury service even after the problem was identified in *Osorio.* But the unequal treatment of minorities, absent an effect on the defendant's rights, is simply not within the purview of the Sixth Amendment. If such claims are constitutionally cognizable, they must be so under the Fifth and Fourteenth Amendments and not the Sixth.

### B. *The Fifth Amendment*

The Supreme Court has recently established that criminal defendants, regardless of their race, may also have third-party standing to assert the rights of prospective jurors. *Powers v. Ohio,* 499 U.S. 400, 413–14, 111 S.Ct. 1364, 1372–73, 113 L.Ed.2d 411 (1991). In the context of peremptory challenges excluding minorities from service on a particular petit jury, discriminatory intent must be proven. *Batson v. Kentucky,* 476 U.S. 79, 93–94, 106 S.Ct. 1712, 1721–22, 90 L.Ed.2d 69 (1986). But it is not so clear that discriminatory intent need be proven when a defendant, as a third-party proponent of the rights of minority jurors, challenges the exclusion of minorities from all jury service. Whereas no one has a right to serve on a particular petit jury, a defendant could cite *Powers,* 499 U.S. at 407, 111 S.Ct. at 1368–69 ("[W]ith the

---

1. In any event, there does not appear to be a compelling reason for substituting the disparity of risk measure for the straightforward absolute disparity measure for determining Sixth Amendment violations. The primary defect of the latter test—understatement of the effects of exclusion on small groups, with a concomitant increase in the chance that such groups will be underrepresented in the defendant's petit jury—is not a relevant factor under the Sixth Amendment. The argument for using the disparity of risk test is much stronger in the equal protection context, and that test may even be superior, or a useful supplement, to statistical decision theory, which we endorsed in *Alston v. Manson,* 791 F.2d 255 (2d Cir.1986), *cert. denied,* 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987), for equal protection claims. *See* Detre, *supra,* at 1926. I see no inconsistency in having distinct tests for the two types of claims, given that the "substantial underrepresentation" element has different purposes under the Sixth Amendment and the Equal Protection Clause, as explained above.

exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process."), to argue that the right to serve on juries at all is a fundamental right akin to the right to vote, *cf. Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). If jury service is held to be a fundamental right, state action infringing that right receives heightened scrutiny regardless of discriminatory intent. *Cf. City of New York v. United States Dep't of Commerce,* 34 F.3d 1114, 1129–30 (2d Cir.1994) (*prima facie* case of violation of fundamental right to vote may be made without showing of discriminatory intent).

I mention this novel equal protection argument, which was not raised by Jackman here or in the court below, not to endorse it, but only to show that the underrepresentation of small groups is not properly considered under the Sixth Amendment. I do not mean to imply that I would recognize such a fundamental right to jury service if the claim were properly before this court. Unenumerated fundamental constitutional rights should never be lightly inferred. Nevertheless, a Fifth Amendment claim, not a Sixth Amendment claim, is the proper posture in which to present this question to us. We could then squarely face the issue of whether the underrepresentation of small groups in jury wheels violates the Constitution even absent intentional discrimination or an effect on a defendant's rights.

In conclusion, Jackman seems to have had an available remedy under the Jury Selection and Service Act and a colorable argument for relief under the Fifth Amendment. Given that Jackman is procedurally barred from pressing those claims, we should not alter our Sixth Amendment jurisprudence to cover the claim Jackman does bring. I therefore respectfully dissent.